**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION**

| | | |
|---|---|---|
| LEHMAN BROTHERS HOLDINGS, INC., | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | CIVIL ACTION NO. H-09-0672 |
| | § | |
| CORNERSTONE MORTGAGE COMPANY, | § | |
| | § | |
| Defendant. | § | |

**MEMORANDUM AND ORDER**

This is a breach of contract suit arising from two residential mortgage loans originated by Cornerstone Mortgage Company and purchased by Lehman Brothers Bank, now called Aurora Bank, FSB. Lehman Brothers Bank (LBB) purchased the loans under a Loan Purchase Agreement, which incorporated by reference a Seller's Guide. The Seller's Guide contained two provisions relevant to this case: one requiring Cornerstone to indemnify LBB for losses caused by Cornerstone's breach of the Seller's Guide; and one requiring Cornerstone to repurchase any loan that went into early payment default because of the debtor's failure to make initial monthly payments. LBB asserts that after it purchased the loans from Cornerstone, they were sold to LBB's parent company, Lehman Brothers Holdings Inc. (LBH), the plaintiff in this case. LBB later assigned to LBH its rights under the Loan Purchase Agreement and Seller's Guide. In this suit, LBH alleges that for the two loans at issue, Cornerstone breached the Loan Purchase Agreement and Seller's Guide. LBH also alleges that Cornerstone breached contractual indemnification obligations.

Cross-motions for summary judgment are pending. LBH has moved for summary judgment only as to liability, not damages. (Docket Entry No. 55). Cornerstone responded, (Docket Entry

No. 65), and LBH replied, (Docket Entry No. 67).  Cornerstone has also filed a motion for summary

judgment, (Docket Entry No. 59); to which LBH responded, (Docket Entry No. 63); and Cornerstone

replied, (Docket Entry No. 70).[1]  Cornerstone has also filed motions to strike certain summary

judgment evidence submitted by LBH, (Docket Entry Nos. 64, 69).  LBH responded to this motion,

(Docket Entry No. 68).[2]

Based on the motions, responses, and replies; the summary judgment record; and the

applicable law, this court: (1) denies Cornerstone's motions to strike; (2) denies LBH's motion for

partial summary judgment on one ground, but rejects Cornerstone's arguments on each of the other

grounds; and denies Cornerstone's motion for summary judgment.  The parties' arguments and the

reasons for this court's decision are discussed in detail below.

I.      **Background**

LBH is a Delaware corporation with its principal place of business in New York.  (Docket

Entry No. 44, ¶ 5).  LBH is the corporate parent of LBB.  As part of its business, LBB buys and sells

mortgage loans in the secondary mortgage market.  When LBB purchases a mortgage loan, it assigns

the loan to LBH.  (*Id.*, ¶ 9).

Cornerstone Mortgage Company is a mortgage lender incorporated under Texas law and

principally operating out of Houston.  (*Id.*, ¶¶ 6, 10).  Cornerstone sells at least some of its mortgage

---

[1]  Cornerstone moved for summary judgment on the Harris I and II Loans and three additional loans.  The
parties have reached an agreement on the three additional loans and this court does not consider them in this
opinion.

[2]  The parties filed an agreed motion to file the motions for summary judgment, responses, and replies, under
seal.  (Docket Entries No. 56, 61, 62).  That motion is denied to the extent that the parties may not simply file
their motions and related documents under seal, but instead must file them in the publicly accessible court
records, with only the redactions necessary to protect confidential information from disclosure.  The parties
may file a complete unredacted set under seal.

loans to investors in the secondary mortgage market.  (*Id.*).  Financial institutions that purchase mortgage loans from loan originators and agree to service the loans acquire both the right to receive the borrowers' mortgage payments and the risk of default.

On December 31, 2004, LBB and Cornerstone entered into a Loan Purchase Agreement under which LBB agreed to purchase residential mortgages from Cornerstone.  That Agreement incorporated by reference the Seller's Guide of Aurora Loan Services LLC.  (Docket Entry No. 60, Ex. 3, Loan Purchase Agreement).  Aurora Loan Services is the loan service company used by LBB and LBH.  The two residential mortgage loans at issue, the Harris I Loan and the Harris II Loan, were purchased by LBB under the Loan Purchase Agreement between March 2006 and February 2007.  (Docket Entry No. 60, Ex. 1, Belanger Aff., ¶ 4).

The Seller's Guide created repurchase and indemnification obligations triggered by certain events.  One such event was "early payment default."  Such a default occurs if the mortgagor is late on: (a) the first monthly payment only; or (b) the first monthly payment or the second monthly payment.  Whether the repurchase obligation is triggered by late payment on the first monthly payment only, or late payment on either the first or second monthly payment, depends on whether the seller was authorized to use "Delegated Underwriting Authority."  The Seller's Guide stated:

> Early Payment Default Loans are subject to repurchase by the Seller at the Repurchase Price . . . .
>
> For Mortgage Loans prior-approved by purchaser . . . a mortgage loan has an early payment default if the first monthly payment due Purchaser is not made within thirty (30) days of its due date.
>
> For Mortgage Loans delivered pursuant to Seller's Delegated Underwriting Authority, a Mortgage Loan has an early payment default if either the first or second monthly payment due the Purchaser is not made within 30 days of each such monthly payment's respective due date.

3

(Docket Entry No. 63, Ex. 1B, Seller's Guide, § 715).  Delegated Underwriting Authority could be authorized for all loans except: (1) subprime loans; (2) loans for which there was a submitted or approved "Loan Parameter Exception Request" or any loan not conforming to guidelines; and (3) loan amounts greater than $2,000,000.000.  (Docket Entry No. 63, Ex. C, Cornerstone Delegated Underwriting Authority Authorization Letter).   Aurora Loan Services granted Cornerstone Delegated Underwriting Authority for all eligible loans.  (*Id.*).  The Harris II Loan was eligible for Delegated Underwriting Authority, but the Harris I loan was not.

The Seller's Guide also created indemnification obligations triggered by a breach of the Seller's Guide or the Loan Purchase Agreement, including misrepresentations about the loans.  The Seller's Guide stated:

> . . . . Seller shall indemnify Purchaser and Purchaser's designee (including, without limitation any subsequent holder of any Note) from and hold them harmless against all claims, losses, damages, penalties, fines, claims, forfeitures, lawsuits, court costs, reasonable attorneys' fees, judgment and any other costs, fees, and expenses that the Purchaser may sustain in any way related to or resulting from any fact or failure to act or any breach of any warranty, obligation, representation, or covenant contained in or made pursuant to this Seller's Guide or the Loan Purchase Agreement by any agent, employee, representative or officer of Seller or Seller's correspondent . . . . It is understood and agreed that any subsequent holder of any Note acquired hereunder by Purchaser shall be a third party beneficiary of the Loan Purchase Agreement and this Seller's Guide.

(Docket Entry No. 63, Ex. 1B, Seller's Guide, § 711).

LBH claims that LBB purchased the Harris I and Harris II loans on December 4, 2006 and sold them to LBH on January 31, 2007 and April 2, 2008, respectively.  (Docket Entry No. 63, Ex. 1, Trumpp Aff. ¶¶ 9 (Harris I Loan), 18 (Harris II Loan)); (Docket Entry No. 60, Ex. 5, Loan Chart). On September 2, 2008, LBB also assigned its rights under the Loan Purchase Agreement and the

Seller's Guide to LBH.  (Docket Entry No. 63, Ex. 1D, Lehman Brothers Assignment Agreement).
For both loans, LBH alleges that Cornerstone breached the Loan Purchase Agreement and Seller's
Guide.  LBH also alleges that Cornerstone breached Indemnification Agreements LBB and
Cornerstone reached after the loans went into early payment default.  The details of LBH's
allegations with respect to each loan are set out below.

Cornerstone originated the Harris I mortgage loan on September 28, 2006, in the amount of
$2,200,000.00.  (Docket Entry No. 60, Ex. 1, Belanger Aff., ¶ 4).  The mortgage was a first lien on
the Highland Park, Texas residence of Dalton D. Harris III.  (Docket Entry No. 60, Ex. 4, Trumpp
Depo., 112–13).  LBB purchased the loan for $2,237,331.80.  (Docket Entry No. 63, Ex. 1, Trumpp
Aff., ¶ 9).  Because the loan exceeded $2,000,000.00, it was ineligible for Delegated Underwriting
Authority.

On January 31, 2007, LBH alleges that LBB sold it the Harris I Loan.  (Docket Entry No.
60, Ex. 4, Trumpp Depo., 112–15; Ex. 5, Loan Chart).  LBH also alleges that on the same day it
purchased the Harris I loan, it resold the loan to Structured Asset Securities Corporation, which
deposited the loan in a structured adjustable rate mortgage trust called "SARM 2007-1."  (Docket
Entry No. 63, Ex. 1, Trumpp Aff., ¶ 9); (Docket Entry No. 60, Ex. 4, Trumpp Depo. at 112–15).
LBH alleges that it sold the loan to Structured Asset pursuant to a Mortgage Loan Sale and
Assignment, which included repurchase rights for Structured Asset Securities "if the . . . Mortgagor
files to make the first scheduled payment."  (Docket Entry No. 63, Ex. 1-G, 2007 Mortgage Loan
Sale and Assignment, § 1.04(d)).

Cornerstone originated the Harris II loan, in the amount of $400,000.00, on September 28,
2006.  (Docket Entry No. 60, Ex. 1, Belanger Aff., ¶ 4).  LBB purchased the loan from Cornerstone

5

on December 4, 2006, for $403,538,25.  (Docket Entry No. 63, Ex. 1, Trumpp Aff., ¶ 18).  Unlike the Harris I Loan, the Harris II Loan was eligible for Delegated Underwriting Authority.  And unlike the Harris I Loan, LBB retained the Harris II Loan and did not immediately sell it to LBH.  (Docket Entry No. 60, Ex. 5, Loan Chart).

Records submitted by LBH show that Harris failed to make his first monthly payment on the Harris I Loan and his first two monthly payments on the Harris II Loan.[3]  On February 15, 2007, Aurora Loan Services sent a notice to Cornerstone that the Harris II loan was in early-payment default and demanded that Cornerstone repurchase the loan within 30 days.  (Docket Entry No. 63, Ex.1-Z, Harris II Notice Letter).  As to the Harris I Loan, the early payment default triggered Structured Asset's repurchase rights.  LBH repurchased the loan from Structured Asset.  *See* (Docket Entry No. 63, Ex. 1-K, Loan Liquidation Email).  On March 19, 2007, Aurora Loan Services sent a notice to Cornerstone that the Harris I loan was in early payment default, and demanded that Cornerstone repurchase the loan within 30 days.  (Docket Entry No. 60, Ex. 13).

Cornerstone did not repurchase either loan.  Instead, Cornerstone and LBB entered into negotiations.  On April 2, 2007, the parties reached an indemnification agreement for each loan (the "Harris Indemnification Agreements").  (Docket Entry No. 63, Exs. 1-O, Harris I Indemnification Agreement;  1-AA, Harris II Indemnification Agreement).   In the Harris Indemnification Agreements, Cornerstone acknowledged that each loan was in early payment default and that LBB had the right to require Cornerstone to repurchase each loan.  (*Id.*).  LBB agreed to refrain from

---

[3]   Harris did eventually make payments on both loans.  For the Harris I Loan, he sent a check for $43,335.43 to Aurora Services, which received it on March 19, 2007.  The check was for the payments due in January, February, and March 2007.  (Docket Entry No. 63, Ex. 1-I, Harris I Payment Record; Ex. 1-J, Harris I Check).  For the Harris II Loan, Harris sent a check for $10,426.60 to Aurora Services, which was received on March 19, 2007.  The check covered the payments due in January, February, and March.  (Docket Entry No. 63, Ex. 1, Trumpp Aff., ¶ 19; Ex. 1-X, Harris II Check; Ex. 1-Y, Harris II Payment Record).

exercising its repurchase rights in exchange for Cornerstone's promises to repurchase each loan if it became more delinquent and to indemnify LBB for losses. (*Id.*). The repurchase provision in the Harris I Indemnification Agreement stated:

> Agreement to Repurchase. The seller agrees that if the Mortgage Loan(s) become(s) thirty (30) days delinquent, LBB and/or Aurora reserve the right to demand repurchase of the Mortgage Loan(s) by the Seller. The Seller agrees to repurchase the Mortgage Loan(s) within fifteen (15) days of receipt of the repurchase demand.

(*Id.*, Ex. 1-O, Harris I Indemnification Agreement, § 1). The Harris II Indemnification Agreement contained the same language except that Harris had to be 90 days – rather than 30 days — delinquent before LBB had the right to demand repurchase by Cornerstone. (*Id.*, Ex. 1-AA, Harris II Indemnification Agreement). Under the Harris Indemnification Agreements, if LBB chose not to exercise its right to demand repurchase, LBB could exercise its right to demand indemnification for losses caused by the loan default. The Harris Indemnification Agreements required Cornerstone to "pay and discharge within thirty (30) days of written demand by [LBB] and/or Aurora . . . all Losses made, invoiced or apportioned against [Cornerstone] by [LBB] and/or Aurora." (*Id.*, § 4).

Harris again became delinquent on his payments for both loans.[4] On April 21, 2007, Aurora Loan Services sent Cornerstone a letter demanding repurchase of both loans. (Docket Entry No. 63, Ex. 1-P, April 21, 2007 Aurora Services Demand Letter).[5] Cornerstone did not repurchase either

---

[4]  The record shows that Harris did not make the payments on the Harris I Loan due on April 1, 2007 and on May 1, 20007 until June 5, 2007. (Docket Entry No. 63, Ex. 1-I, Harris Payment Record). Similarly, Harris did not make the payment on the Harris II Loan due on June 1, 2007 until September 5, 2007. (Docket Entry No. 63, Ex. 1-Y, Harris II Payment Record).

[5]  The letter is dated "April 21, 2010." In his affidavit, Zachary Trumpp, a former employee of LBH, testified that the letter was sent on April 21, 2007. Because the date on the original document automatically updates on the word processing system, the date reads "April 21, 2010" when printed. (Docket Entry No. 63, Ex. 1, Trumpp Aff., ¶ 15).

loan.

LBH alleges that almost a year later, on April 1, 2008, it sold the Harris I loan to Structured Asset a second time.  Structured Asset deposited the loan into Residential Loan Trust 2008-2. (Docket Entry No. 63, Ex. 1-R, Mortgage Asset Sale Agreement — Residential Loan Trust 2008-2, Mortgage Pass-Through Certificates).  LBH argues that it sold the loan for $1,538,107.43, resulting in a $699,224.37 loss.  (Docket Entry No. 63, Ex. 1, Trumpp Aff., ¶ 16).  LBB alleges that on April 2, 2008, it sold the Harris II Loan to LBH, which retained the loan.  (Docket Entry No. 63, Ex. 1, Trumpp Aff.,  ¶ 16).  The basis of LBH's damages claim for the Harris II Loan is that on January 23, 2009, after an equity analysis, it charged off the loan.  (Docket Entry No. 63, Ex. 1-BB).  LBH alleges that this charge-off resulted in a $399,225.20 loss.  (Docket Entry No. 63, Ex. 1, Trumpp Aff., ¶ 24).

On September 2, 2008, LBB assigned its rights under the Loan Purchase Agreement and the Seller's Guide to LBH.  (Docket Entry No. 63, Ex. 1D, Lehman Brothers Assignment Agreement). On March 6, 2009, LBH filed this suit against Cornerstone, seeking contract damages for Cornerstone's breach of the original Loan Purchase Agreement and the Seller's Guide.  (Docket Entry No. 1, Plaintiff's Original Complaint).  LBH later amended its complaint to add an allegation that Cornerstone breached the Harris I Indemnification Agreement and to seek damages for that breach.  (Docket Entry No. 1, Plaintiff's Third Amended Original Complaint).  On June 25, 2010, three weeks after LBH filed its third amended complaint, LBB assigned its rights under the Harris I Indemnification Agreement to LBH.  (Docket Entry No. 63, Ex. 1-T, June 25, 2010 Assignment Agreement).  On October 19, 2010, LBH demanded that Cornerstone indemnify it for losses related to both Harris Loans.  (Docket Entry No. 63, Ex. 1-U, Indemnification Demand Letter).

LBH has moved for summary judgment on its claim that Cornerstone breached the Indemnification Agreements with respect to the Harris I and Harris II Loans. Cornerstone has cross-moved for summary judgment that, as a matter of law, it has no liability to LBH. Both parties have also filed a motion to seal the summary judgment motions, responses, and replies. Finally, Cornerstone has moved to strike certain evidence submitted by LBH in support of its motion for partial summary judgment and in response to Cornerstone's cross-motion for summary judgment. The parties agree that New York law governs the cross-motions for summary judgment.

## II.      The Motions to Seal

This court issued a protective order in this litigation to protect against the disclosure of information covered by the attorney-client privilege or work-product protection, including Aurora Loan Services documents discussing foreclosure. (Docket Entry No. 53). Based on this narrow protective order, the parties have filed an agreed motion to file all the motions for summary judgment, the responses, and the replies under seal. (Docket Entries No. 61, 62). Cornerstone also filed a redacted motion for summary judgment and moved to file an unredacted motion under seal.

Courts distinguish between the standard for an order sealing documents filed with the court and the standard for a protective order limiting dissemination of documents produced in discovery. In analyzing requests to seal court documents, courts emphasize the presumption of public access to judicial records and require a more stringent showing than the good-cause showing required to limit access to document exchanged in discovery. *Compare In re Terra Int'l Inc.*, 134 F.3d 302, 306 (5th Cir. 1998) (per curiam) (protective order for documents exchanged in discovery) *with S.E.C. v. Van Waeyenberghe*, 990 F.2d 845, 848 (5th Cir. 1993) (sealing documents filed with the court). The Fifth Circuit has explained that the presumptive right of public access to judicial records applies

even when the information may not be of particular interest to the public.  *See Macias v. Aaron Rents, Inc.*, 288 F. App'x 913, 915 (5th Cir. 2008).

Here, though LBH claims that parts of the summary judgment filings are protected under either the attorney–client privilege or the work-product doctrine or may otherwise be "confidential," the parties have not made a showing of the need to seal all the motions, responses, and replies.  The motion to file all these documents under seal is denied.  The parties may file redacted copies, as long as the redactions are limited to what is necessary to prevent public access to confidential, privileged, or protected information, or to comply with Rule 5.2 of the Federal Rules of Civil Procedure.  An unredacted copy may be filed under seal.

## III.    The Motions to Strike

Cornerstone filed two motions to strike evidence submitted by LBH in support of its motion for partial summary judgment and in response to Cornerstone's motion for summary judgment. (Docket Entries No. 64, 69).  These motions challenge the authentication of certain documents and the relevancy of others.

### A.    Challenges to Authentication

Cornerstone has moved to strike the following documents on the basis that they are not properly authenticated:

(1)    "all Exhibits because none are properly authenticated and are therefore not admissible," (Docket Entry No. 64, at 2);

(2)    all testimony in the first affidavit of Zachary Trumpp and all the documents it purports to authenticate, (*id.*, at 2); (Docket Entry No. 69, at 3);

(3)    all testimony in the second affidavit of Zachary Trumpp and all documents it purports to authenticate, (Docket Entry No. 69, at 4)

(4)    the Indemnification Agreements between Cornerstone and LBB relating to the Harris

10

I and Harris II loans, (Docket Entry No. 64, at 3);

(5)     four letters from Aurora Loan Services to Cornerstone demanding loan repurchase, (Docket Entry No. 63, Exs. 1-M, 1-P, 2-L, 2-R); (Docket Entry No. 64, at 3); (Docket Entry No. 69, at 5);

(6)     a check from Dalton Harris to Aurora Loan Services, and Aurora Loan Service bank reflecting a payment from LBH, (Docket Entry No. 63, Exs. 1-J, 1-L);

(7)     documents that LBH offers to show internal analyses of the loans, but which Trumpp did not explicitly authenticate, (Docket Entry No. 63, Exs. 2-F, 2-N, 2-T, 2-X, 2-Y); (Docket Entry No. 69, at 5);

(8)     the affidavit of Nathan Medvidofsky, LBH's property-value appraiser, (Docket Entry No. 63, Ex. 3); (Docket Entry No, 69, at 5); and

(9)     the affidavit of Daniel Glanz, vice president at LAMCO LLC, a wholly owned subsidiary of LBH, (Docket Entry No. 63, Ex. 4), and the documents the affidavit addresses, (Docket Entry No. 69, at 5–6).

"The requirement of authentication or identification as a condition precedent to admissibility is satisfied by evidence sufficient to support a finding that the matter in question is what its proponent claims." FED. R. EV. 901(a). "The standard for authenticating evidence is low and may be satisfied 'by evidence sufficient to support a finding that the matter in question is what its proponent claims.'" *United States v. Carroll*, 2000 WL 45870, at *3 (E.D. La. Jan. 20, 2000) (quoting *United States v. Arce*, 997 F.2d 1123, 1128 (5th Cir. 1993); *see also United States v. Jackson*, 625 F.3d 875, 881 (5th Cir. 2010) ("[The Fifth Circuit does not require conclusive proof of authenticity before allowing the admission of disputed evidence. . . . [Rule 901] merely requires some evidence which is sufficient to support a finding that the evidence in question is what its proponent claims it to be."). Federal Rule of Evidence 901(b) lists nonexclusive examples of appropriate methods of authentication, including (1) the testimony of a witness with knowledge; (2) nonexpert opinion on handwriting; (3) comparison by the trier of fact or expert witness; and (4)

distinctive characteristics, appearance, contents and the like.  *See* FED. R. EV. 901(b).  "A document may be authenticated with circumstantial evidence, 'including the document's own distinctive characteristics and the circumstances surrounding its discovery.'"  *Carroll*, 2000 WL 45870, at *3 (citing *Arce*, 997 F.2d at 1128).

Trumpp stated in his affidavit that he has worked for both LBH and Aurora Loan Services. Trumpp testified to the authenticity of each document.  His experience with Aurora Loan Services and LBH, and his testimony as to the documents' authenticity, provides sufficient circumstantial evidence for this court to find that the documents authenticated in the Trumpp affidavits are what they purport to be.

Cornerstone also challenges whether Trumpp's affidavit laid the proper foundation to authenticate the documents under Federal Rule of Evidence 803(6).  *See, e.g.*, *Jackson*, 625 F.3d at 882 (listing the showings required to authenticate a business record).  LBH, however, does not need to make a Rule 803(6) showing because Cornerstone has not objected to these document as hearsay.

Cornerstone also argues that Trumpp did not prepare any of the documents at issue and is "incompetent" to authenticate them.  But Rule 901 does not require that Trumpp have participated in the creation of these documents to authenticate them.  The rule only requires circumstantial evidence of the documents' authenticity.  Even if LBH needed to show that these documents are covered under Rule 803(6), its employee/affiant need not have participated in their creation.  *See Falk v. Axiam Inc.*, 944 F. Supp. 542, 546 (S.D. Tex. 1996) ("Where circumstances indicate that the record are trustworthy, the party seeking to introduce them does not have to present the testimony of the party who kept the record or supervised its preparation." (quoting *United States v. Veytia-Bravo*, 603 F.2d 1187, 1191–92 (5th Cir. 1979)); *Jackson*, 625 F.3d at 882 (noting that to

12

authenticate business records, "'[t]here is no requirement that the witness who lays foundation be the author of the record or be able to personally attest to its accuracy")  *Jackson*, 625 F.3d at 882. The Trumpp affidavits and the documents they authenticate are proper summary judgment evidence.

There is also sufficient circumstantial evidence to authenticate the remaining challenged documents.  The Indemnification Agreements between Cornerstone and LBB relating to the Harris I and Harris II loans are signed by a Cornerstone executive vice president and were produced by Cornerstone.  As to Cornerstone's challenge to four letters from Aurora Loan Services demanding loan repurchase, (Docket Entry No. 63, Exs. 1-M, 1-P, 2-L, 2-R), Cornerstone raised no challenge against a similar repurchase demand letter sent on August 29, 2003, (Docket Entry No. 63, Ex. 1-C). A document may be authenticated by comparing it to documents whose authenticity is not in question.  FED. R. EV. 901(b).  The similarity between this demand letter and the four demand letters to which Cornerstone objects provides circumstantial evidence of authenticity.

The check from Dalton Harris and the Aurora Loan Services bank records are also properly authenticated.  Cornerstone argues that these documents are not properly authenticated by LBH because they were created by unaffiliated entities.  There is, however, circumstantial evidence of authenticity.  The Harris check is signed and has the distinctive characteristics of a check.  *See* FED. R. EV. 901(b).  The bank records also have characteristics of bank records and Trumpp has testified to their authenticity.  This provides sufficient circumstantial evidence of authenticity.

As to the internal loan analysis documents, Cornerstone argues only that the documents are not properly authenticated because Trumpp did not explicitly address them in his second affidavit. Rule 901(b) does not require this.  Trumpp testified that Aurora Loan Services and LBH conducted internal analyses on each loan and made decisions based on the results.  Trumpp's testimony and

13

the documents' features provide circumstantial evidence of these documents' authenticity.  These documents are properly considered on a motion for summary judgment.

The motion to strike the Trumpp affidavits and the documents they purport to authenticate is denied.  As to the Medvidofsky and Glanz[6] affidavits, this court does not rely on these, or the documents they purport to authenticate; the motion to strike these documents is moot.

### B.     Challenges to Relevance

Cornerstone has also moved to strike the following the documents:

(1)      the Indemnification Assignment, (Docket Entry No. 63, Ex. 1-T), and an October 19, 2010 demand letter from LBH, on the basis that the claims arising based on these documents are not supported by LBH's pleadings; and

(2)      any documents "offered in support of LBH's assertion that LBB transferred to LBH an ownership interest in the Harris Loans because such documents are extraneous to an unambiguous document identified in sworn testimony as the contract governing the purchase by LBH of the Harris Loans."

Cornerstone argues that any claims arising from the Harris Indemnification Agreements and the October 19 demand letter are not supported by LBH's pleadings.  LBH's Third Amended Complaint alleges that Cornerstone breached the Indemnification Agreement.  (Docket Entry No. 44, Plaintiff's Third Amended Original Complaint, ¶¶ 4, 31–40).  These documents support this claim and are properly considered on summary judgment.

Cornerstone also argues that this court should not consider any documents showing that LBB

---

[6]  During the pretrial conference on January 29, 2011, this court deferred ruling on whether Glanz may testify at trial.  His affidavit describes LBH's loan-tracking system, and LBH stated that he would testify on the loan-tracking system at trial.  Cornerstone objected on the basis that LBH did not identify him as a person with knowledge him until October 26, 2010, the last day of discovery, and that it did not have time to depose him. LBH responded that it was not aware of Glanz until shortly before October 2010.  LBH also offered to make Glanz available for a deposition prior to trial.  While this court does not consider his affidavit in this motion for summary judgment, Glanz may testify at trial.  Cornerstone may depose him before trial at LBH's expense.

sold the Harris Loans to LBH.  Cornerstone argues that evidence of the sale of these loans should

be stricken because evidence in the record shows that LBB did not sell the loans to LBH.  This

argument is based on a "Purchase Price and Term Letter" dated January 1, 2005.  (Docket Entry No.

60, Ex. 6, Purchase Price and Terms Letter).   Heston Gray, LBB's designated corporate

representative, testified that the Purchase Price and Term Letter governed the sale of the loans at

issue in this litigation.  The letter states in part as follows:

> Lehman Brothers Holdings . . . hereby confirms its agreement to
> purchase and Lehman Brothers Bank . . . hereby confirms its
> agreement to sell . . . certain fixed and floating rate first lien
> conventional one-to-four family residential mortgage loans originated
> by [LBB] and certain small balance commercial loans originated or
> purchased by [LBB] . . . on the terms and conditions set forth below
> . . . .

(*Id.*).  Cornerstone argues that because it, not LBB, originated the loans at issue, LBB did not sell

these loans to LBH because the letter states that LBB sold residential loans that it originated.

Although the letter states that LBB sold some loans that it did not originate, these were only "small

balance commercial loans," not residential loans such as those at issue here.  LBH responds that the

Purchase Price and Term Letter does not exclude LBB's sale of the Harris Loans to LBH under a

different set of terms.  LBH argues that the documents are relevant  because they are evidence that

it purchased the Harris Loans, even if not under the Purchase Price and Term Letter.

The Purchase Price and Term Letter is evidence that the Harris Loans were not purchased

under that Letter.  But the record does not show that, as a matter of law, the Letter was the sole basis

for LBH to purchase loans from LBB.  The rule requiring exclusion of extrinsic evidence to interpret

unambiguous language is not applicable.  The documents Cornerstone objects to as irrelevant are

properly considered.

IV.     **The Summary Judgment Motion**

    A.     **The Legal Standard**

Summary judgment is appropriate if no genuine issue of material fact exists and the moving party is entitled to judgment as a matter of law. FED. R. CIV. P. 56(c). "The movant bears the burden of identifying those portions of the record it believes demonstrate the absence of a genuine issue of material fact." *Triple Tee Golf*, *Inc. v. Nike*, *Inc.*, 485 F.3d 253, 261 (5th Cir. 2007) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–25 (1986)).

If the burden of proof at trial lies with the nonmoving party, the movant may satisfy its initial burden by "'showing' — that is, pointing out to the district court — that there is an absence of evidence to support the nonmoving party's case." *See Celotex*, 477 U.S. at 325. While the party moving for summary judgment must demonstrate the absence of a genuine issue of material fact, it does not need to negate the elements of the nonmovant's case. *Boudreaux v. Swift Transp. Co.*, 402 F.3d 536, 540 (5th Cir. 2005) (citation omitted). "A fact is 'material' if its resolution in favor of one party might affect the outcome of the lawsuit under governing law." *Sossamon v. Lone Star State of Texas*, 560 F.3d 316, 326 (5th Cir. 2009) (quotation omitted). "If the moving party fails to meet [its] initial burden, the motion [for summary judgment] must be denied, regardless of the nonmovant's response." *United States v. $92,203.00 in U.S. Currency*, 537 F.3d 504, 507 (5th Cir. 2008) (quoting *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994) (en banc)).

When the moving party has met its Rule 56(c) burden, the nonmoving party cannot survive a summary judgment motion by resting on the mere allegations of its pleadings. The nonmovant must identify specific evidence in the record and articulate how that evidence supports that party's claim. *Baranowski v. Hart*, 486 F.3d 112, 119 (5th Cir. 2007). "This burden will not be satisfied

by 'some metaphysical doubt as to the material facts, by conclusory allegations, by unsubstantiated assertions, or by only a scintilla of evidence.'" *Boudreaux*, 402 F.3d at 540 (quoting *Little*, 37 F.3d at 1075). In deciding a summary judgment motion, the court draws all reasonable inferences in the light most favorable to the nonmoving party. *Connors v. Graves*, 538 F.3d 373, 376 (5th Cir. 2008).

The moving party bears a heavier burden when seeking summary judgment on a claim or defense on which it would bear the burden of proof at trial. *Fontenot v. Upjohn Co.*, 780 F.2d 1190, 1194 (5th Cir. 1986). "[I]f the movant bears the burden of proof on an issue, either because he is the plaintiff or as a defendant he is asserting an affirmative defense, he must establish beyond peradventure all of the essential elements of the claim or defense to warrant judgment in his favor." *Id.* (emphasis in original); *see also Meecorp Capital Markets LLC v. Tex-Wave Industries LP*, 265 F. App'x 155, 157 (5th Cir. 2008) (per curiam) (unpublished) (quoting *Fontenot*, 780 F.2d at 1194). But "'[w]hen the moving party has carried its burden under Rule 56(c), its opponent must do more than simply show that there is some metaphysical doubt as to the material facts . . . . Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no 'genuine issue for trial.'" *Scott v. Harris*, 550 U.S. 372, 380, 127 S. Ct. 1769 (2007) (quoting *Matsushita Elec. Industrial Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586–87, 106 S. Ct. 1348 (1986)).

### B.    Analysis

LBH moved for summary judgment on its claim that Cornerstone is liable for breaching the Harris Indemnification Agreements. LBH moves for summary judgment only as to liability, not damages. Cornerstone responds that LBH's summary judgment motion should be denied, and Cornerstone's cross-motion granted, because:

(1)     LBH's complaint does not plead any rights pursuant to the Harris Indemnification Agreements;

(2)     the Harris Indemnification Agreements are void under New York's champerty statute, N.Y. JUDICIARY L. § 489;

(3)     LBH cannot demonstrate an ownership interest in Harris Loans;

(4)     the Harris Indemnification Agreements are neither valid nor assignable;

(5)     LBH cannot establish damages because LBB suffered no damages and LBH "stands in its shoes";

(6)     finding that Cornerstone owed LBH a duty to indemnify under the Harris Indemnification Agreements because such a duty would "produce an absurd result forbidden by New York law; and

(7)     LBH cannot establish damages related to the Harris II Loan.

(8)     repurchase is the sole remedy under the Loan Purchase Agreement and Seller's Guide; and

(9)     LBH cannot assert claims based on breaches of the Loan Purchase Agreement and Seller's Guide there was no repurchase demand.

Cornerstone also argues that LBH cannot establish its entitlement to attorneys' fees because LBH cannot establish a breach.

"The elements of a breach of contract claim under New York law are: (1) the existence of a contract; (2) due performance of the contract by the plaintiff; (3) breach of contract by the defendant; and (4) damages resulting from the breach." *Columbia Artists Mgmt., LLC v. Alvarez*, No. 08 Civ. 11254(LBS), 2010 WL 5396097, at *3 (S.D.N.Y. Dec. 23, 2010). LBH has produced evidence for each element of its breach of contract claim. The evidence shows that after the Harris I and Harris II loans went into early payment default, LBB, Aurora Loan Services, and Cornerstone agreed to the Harris Indemnification Agreements. Under the agreements, LBB and Aurora Loan Services agreed to forego demanding repurchase and indemnification under the Loan Purchase

Agreement and Seller's Guide in exchange for Cornerstone's promise that if Harris was again late on monthly payments, LBB had the right to demand repurchase and indemnification under the Loan Purchase Agreement and Seller's Guide and to demand indemnification under the Harris Indemnification Agreements.  The evidence shows that Harris was again late on the monthly payments for both loans.  LBH has produced evidence demonstrating that it acquired both Harris Loans and all of LBB's rights under the Harris Indemnification Agreements, Loan Purchase Agreement, and Seller's Guide.  LBH has also produced evidence demonstrating that it has suffered damages on the Harris Loans for which it should be indemnified under these agreements.  As to the Harris I Loan, LBH has submitted evidence demonstrating that it sold the loans below the purchase price, and incurred a loss.  As to the Harris II loan, LBH has submitted evidence that it recognized a loss related to the loan.  LBH has produced substantial evidence in support of each element of its breach of contract claim.  Each of Cornerstone's arguments as to the existence of a triable issue of fact is discussed below.

### 1.       The Pleadings

Cornerstone first argues that LBH's motion should be denied and Cornerstone's granted because LBH's initial complaint did not assert rights under the Harris Indemnification Agreements. LBH amended its complaint to assert claims under these agreements.  Cornerstone argues that when LBH amended its complaint to add these claims, it had not yet been assigned the rights under the Harris Indemnification Agreements.  But Cornerstone has provided no authority for its contention that LBH should not be allowed to assert claims based on these agreements because the assignment of the rights under the agreements did not occur until after the complaint was amended.

Courts have held that a party may assert claims based on rights assigned after the filing of

19

a lawsuit asserting those rights or after a pleading asserting those rights, provided that there is no unfair prejudice. *Dubuque Stone Prods. Co. v. Fred L. Gray Co.*, 356 F.2d 718, 723–24 (8th Cir. 1966) ("We cannot accept [the defendant's] argument that the assignment was invalid because it was made after this suit had been filed. The assignment occurred after filing, but before trial, and [the defendant] suffered no prejudice therefrom . . . ."); *Decorative Ctr. of Houston, L.P. v. Direct Response Pubs., Inc.*, 264 F. Supp. 535, 543–44 (S.D. Tex. 2003) (finding that the plaintiff had standing to bring suit even though the assignment providing the basis of the suit was made one year after the initiation of litigation); *Goldinger Silver Art Co. v. Intn'l Silver Co.*, No. 95 Civ. 9199 (LMM), 1995 WL 702357, at *4 (S.D.N.Y. Nov. 28, 1995) (giving effect to an assignment made after the action began and finding that it was a sufficient basis to assert the claim even though the assignee did not have the right when the action was filed); *Malikyar v. Sramek*, No. C 07-03533 WHA, 2008 WL 4891020, at *4 (N.D. Cal. Nov. 12, 2008) ("An assignment made after the suit has been filed is not invalid if the assignment was made before trial, and the defendant is not prejudiced. A defendant is not prejudiced if the assignment does not cause the party to lose the right to assert any defenses against the assignee which it could have asserted against the assignor.").

Cornerstone does not raise an argument, or produce or identify evidence, that the assignment of the rights under the Harris Indemnification Agreements after the third amended complaint was filed caused any prejudice. This does not provide a basis to deny LBH's motion for partial summary judgment or to grant Cornerstone's motion for summary judgment.

### 2.      New York's Champerty Statute

Cornerstone argues that LBB's assignment of its rights under the Harris Indemnification Agreements violated New York's champerty statute. The statute states:

> [N]o corporation or association, directly or indirectly, itself or by or
> through its officers, agents or employees, shall solicit, buy or take an
> assignment of, or be in any manner interested in buying or taking an
> assignment of a bond, promissory note, bill of exchange, book debt,
> or other thing in action, or any claim or demand, with the intent and
> for the purpose of bringing an action or proceeding thereon . . . .

N.Y. JUDICIARY L. § 489.  As LBH points out, "New York Judiciary Law § 489 has been interpreted by New York courts to only preclude the 'acquisition of a cause of action by a stranger to the underlying dispute . . . in consideration of a bargain for some part of the thing involved.'" *FragranceNet.com, Inc. v. FragranceX.com, Inc.*, 679 F. Supp. 2d 312, 329 n.9 (E.D. N.Y. 2010) (quoting *Richbell Info. Servs., Inc. v. Jupiter Partners*, 280 A.D.2d 208, 723 N.Y.S.2d 134, 139 (2001)).  The assignment here is far different.

New York courts have found that assignments between related entities are not champertous. *See Empresa Cubana Exportadora De Azucar y Sus Derivados v. Lamborn & Co.*, 652 F.2d 231, 236 (2d Cir. 1981) ("New York courts have been careful to limit the application of § 489 to situations where the danger at which it was aimed could conceivably arise. Where the relations between the assignor and the assignee are such as to eliminate that danger, New York courts have refused to apply the statute."); *American Hemisphere Marine Agencies, Inc. v. Kreis*, 244 N.Y.S.2d 602, 603 (Sup. Ct. N.Y. Cty.1963) ("[I]t is uncontradicted that plaintiff and its assignor are interrelated corporations, and it is clear that plaintiff itself was involved in the transactions alleged from the very beginning.  In such circumstance, the assignment was not in the purview of Section 275 of the Penal Law (predecessor of current section 489), and defendants' contentions thereon are rejected."); *Anisom Corp. v. Banque Exel, S.A.*, 40 A.D.2d 968, 968, 338 N.Y.S.2d 848 (N.Y.A.D. 1972) (overturning the denial of rehearing of the district court's order to vacate an attachment because the court wrongly concluded that the attaching party violated the champerty statute in

21

acquiring the interest on which it sought attachment; the party seeking attachment acquired its interest from its parent); *Prudential Oil Corp. v. Phillips Petroleum Co.*, 69 A.D.2d 763, 763, 415 N.Y.S.2d 217 (N.Y.A.D. 1979) (finding that an assignment was not champertous because "the subject assignment . . . was but one small detail of corporate parent restructure involving several subsidiaries and dispositive of a wide range of assets").

Cornerstone has produced no authority to support its claim that an assignment between a parent and its subsidiary could violate New York law.   Under the applicable authority, the assignment is not champertous.

Both parties cite *Trust for the Certificate Holders of the Merrill Lynch Mortgage Investors, Inc. v. Love Funding Corp.*, 591 F.3d 116 (2d Cir. 2010).   In *Love Funding*, the Second Circuit addressed whether an entity assigned a right to sue a mortgage originator violated New York's champerty statute.   The plaintiff, the Trust for Certificate Holders of the Merrill Lynch Mortgage Investors, Inc. ("the Trust"), sued Love Funding Corporation, the originator of a defaulted mortgage held by the Trust.   *Id.* at 117.   Love Funding had entered into a "conduit lending" agreement with Paine Webber Real Estate Securities, Inc., under which Paine Webber would purchase certain mortgage loans.   The agreement was memorialized in a mortgage loan purchase agreement.   Love Funding represented in that agreement that none of the underlying loan were in default.   Under the agreement, if a loan was in default, Paine Webber could demand repurchase or seek indemnification. *Id.* at 118.   Love Funding arranged a $6,400,000.00 loan secured by a mortgage on property in Louisiana.   Paine Webber sold the loan  to Merrill Lynch Mortgage Investors under an agreement between Paine Webber and Merrill Lynch, which, like the agreement between Paine Webber and Love Funding, contained representations that none of the loans was in default.   *Id.* at 118–19.

Merrill Lynch then securitized the loans and assigned to the Trust both the loans and the rights under loan-purchase agreement with Paine Webber.  The loan went into default.  The Trust began foreclosure proceedings in Louisiana state court. The Louisiana state court ruled that the debtor on the original loan had committed fraud to obtain the loan "and that such fraud constituted an event of default."  *Id.* at 119.  The Trust then sued the successor in interest to Paine Webber,  UBS Real Estate Securities, Inc.  The Trust and UBS reached a settlement under which the Trust released its claims against UBS in exchange for UBS's assignment of its rights under Paine Webber's agreement with Love Funding.  *Id.*  After a bench trial, the district court found that UBS's assignment to the Trust violated New York's champerty statute.

The Second Circuit certified the following questions to the New York Court of Appeals:

> 2. As a matter of law, does a party commit champerty when it "buys a lawsuit" that it could not otherwise have pursued if its purpose is thereby to collect damages for losses on a debt instrument in which it holds a pre-existing proprietary interest?

> 3. (a) As a matter of law, does a party commit champerty when, as the holder of a defaulted debt obligation, it acquires the right to pursue a lawsuit against a third party in order to collect more damages through that litigation than it had demanded in settlement from the assignor?

*Id.* at 120.  The New York Court of Appeals, noting that "New York's prohibition of champterty 'has always been limited in scope and largely directed toward preventing attorneys from filing suit merely as a vehicle for obtaining costs,'" distinguished between "'acquiring a thing in action in order to obtain costs,' which constitutes champerty, 'and acquiring it in order to protect an independent right of an assignee,' which does not."  *Id.* (citing *Trust v. Love Funding*, 918 N.E.2d 889 (N.Y. 2010)). The court stated that "'if a party acquires a debt instrument for the purpose of enforcing it, that is not champerty simply because the party intends to do so by litigation.'"  *Id.*

(citing *Trust*, 918 N.E.2d 889).  Relying on the New York Court of Appeals's response, the Second Circuit overturned the district court's finding that the assignment was champertous solely because "the Trust's primary purpose in accepting the Assignment was to buy a lawsuit against Love Funding."  *Id.* at 121.  The court held that the record precluded a finding of champerty as a matter of law.  It remanded to the district court so that it could consider an unconsidered fact question: "whether the Trust's intent in taking the UBS assignment of rights was, in fact, to enforce its interest in [the loan]."  *Id.* at 122.

Under *Love Funding*, there is no violation of the champerty statute as a matter of law, if a plaintiff acquires rights through assignment to "protect an [assignee's] independent right[s]."  591 F.3d at 118.  If, however, there is evidence that the plaintiff acquired rights through an assignment "in order to obtain costs," a triable issue of fact exists.  *Id.*

Cornerstone has not identified or produced evidence demonstrating that LBH acquired rights under the Harris Indemnification Agreements so that it could obtain litigation costs.  There is also no evidence of any prior litigation involving a Lehman Brothers entity and the Harris I or Harris II loans.  To the contrary, the record evidence submitted demonstrates that this is the only litigation involving these loans.  The evidence also demonstrates that LBH acquired rights under the Harris Indemnification Agreements so that it could demand indemnification against losses it realized on the loans.  Cornerstone has not demonstrated either a triable issue of fact or the absence of a fact issue as to whether the assignment of the Indemnification Agreements violated New York's champerty statute.  This argument does not provide a basis to deny LBH's motion or to grant Cornerstone's motion for summary judgment.

### 3.    An Ownership Interest in the Harris Loans

Cornerstone argues that LBH has not demonstrated an ownership interest in the Harris Loans. In support, Cornerstone points to the Purchase Price and Term Letter dated January 1, 2005, confirming an agreement between LBH to purchase residential mortgage loans from LBB. (Docket Entry No. 60, Ex. 6, Purchase Price and Terms Letter). Heston Gray, Lehman Brothers Bank's designated corporate representative, testified that the Purchase Price and Term Letter governed the sale of the loans at issue in this litigation. (Docket Entry No. 65-1, Ex. 1, Heston Gray Depo., 101). The Letter states:

> Lehman Brothers Holdings . . . hereby confirms its agreement to purchase and Lehman Brothers Bank . . . hereby confirms its agreement to sell . . . certain fixed and floating rate first lien conventional one-to-four family residential mortgage loans originated by [Lehman Brothers Bank] and certain small balance commercial loans originated or purchased by [Lehman Brothers Bank] . . . on the terms and conditions set forth below . . . .

(*Id.*). Cornerstone argues that because it, not LBB, originated the Harris Loans, Lehman Brothers Bank did not sell these loans to LBH. Cornerstone cites the Purchase Price and Term Letter to argue that LBB only sold residential loans originated by LBH. In response, LBH argues that it has submitted sufficient evidence demonstrating that LBB sold the Harris Loans to LBH. Given this evidence, LBH argues it need not produce the actual agreement under which LBH purchased the loans.

The following record evidence shows the sale of the Harris Loans:

(1)     two affidavits by LBH's corporate representative, Zachary Trumpp, stating that LBB sold each loan to Lehman Brothers Holdings, (Docket Entry No. 63, Ex. 1, Trumpp Aff., ¶ 8);

(2)     a copy of the mortgage note for each loan endorsed to LBH, (*id.*, Exs. 1-F, Harris I Note; 1-W, Harris II Note);

(3)     copies of Lehman Brothers transaction records showing that LBH acquired the Harris

Loans from LBB, (*id.*, Ex. 1-H); and

(4)     excerpts from the deposition of Heston Gray, the LBB corporate representative, in which Gray testifies that LBH purchased the Harris Loans from LBB, (Docket Entry No. 60, Ex. 8, Gray Depo., 102–03).

The Purchase Price and Terms Letter and Gray's testimony raise a fact issue as to whether LBH purchased the Harris Loans.[7] Gray testified both that LBB sold the loans to LBH and that LBB sold those loans pursuant to the Purchase Price and Terms Letter.  The Purchase Price and Terms Letter's, however, states that LBH only purchased residential loans originated by LBB.  Cornerstone originated the Harris Loans.  The inconsistency in Gray's testimony, and the absence of an explanation of the inconsistency or the production of a different agreement under which the Harris Loans were sold, raises a fact issue as to whether LBB sold the Harris Loans to LBH.  This court denies both LBH's motion for partial summary judgment and Cornerstone's motion for summary judgment.

### 4.     Whether the Harris Indemnification Agreements are Valid and Assignable

Cornerstone raises three arguments challenging whether LBH has demonstrated that the Harris Loans are valid and assignable.  Cornerstone's first argument is that LBB's promise to forego

---

[7] Gray is LBB's, and not LBH's corporate representative.  His testimony does not bind either LBB or LBH, but does provide evidence either party may use.  A Rule 30(b)(6) deposition is admissible against the party designating the representative but is not "binding" on the entity for which the witness testifies in the sense of preclusion or judicial admission.  CHARLES A. WRIGHT *ET AL.*, FEDERAL PRACTICE & PROCEDURE § 2103 (2d ed. 1994).  Rule 30(b)(6) does not bind an entity to its designee's recollection unless it shows that contrary information was not known or unavailable.  Testimony given in a Rule 30(b)(6) deposition is evidence, which, like other deposition testimony, can be contradicted and used for impeachment purposes.  *See A.I. Credit Corp. v. Legion Ins. Co.*, 265 F.3d 630, 637 (7th Cir. 2001); *see also Diamond Triumph Auto Glass, Inc. v. Safelite Glass*, 441 F.Supp.2d 695, 723 n.17 (M.D. Pa. 2006) (rejecting the plaintiff's argument that the court should limit the defendant to the testimony of its corporate representative simply because "the witness could not answer the questions"; the plaintiff never filed a motion to compel or a motion for sanctions and "[t]he Federal Rules of Civil Procedure do not allow such a severe sanction under these circumstances").

its repurchase rights under the Loan Purchase Agreement and Seller's Guide for the Harris I Loan was "sham" consideration for the Harris I Indemnification Agreement.  Cornerstone points out that when the parties negotiated the Harris I Indemnification Agreement, LBB had already sold the Harris Loans to LBH, and LBH had sold the Harris I Loan to Structured Asset.  Cornerstone argues that LBB's promise not to exercise its repurchase rights was a "sham" because it did not possess the loan and could not have sold it back to Cornerstone.  The evidence, however, shows that though LBB did not own the Harris I Loan, it had not yet assigned its rights under the Repurchase Agreement and Seller's Guide and therefore retained its right to demand that Cornerstone repurchase that loan.[8]  The evidence also shows that before negotiating the Harris I Indemnification Agreement, LBH had agreed to reacquire the Harris I Loan from Structured Asset because of the early-payment default, and that Cornerstone was aware of the reacquisition.  Because LBB owned the right to demand repurchase of the Harris I Loan when it entered into the Harris I Indemnification Agreement, and because LBH was about to reacquire the loan, LBB's promise to forbear demanding repurchase at that time provided adequate consideration for the Harris Indemnification Agreements.

Second, Cornerstone argues that a triable issue of fact exists as to the validity of the Harris Indemnification Agreements because LBB, LBH, and Aurora Loan Services did not produce copies of the Harris Indemnification Agreements.  Cornerstone produced these agreements during discovery, but argues that LBH's failure to also produce them creates a fact issue as to whether the Agreements were executed.  In support, Cornerstone points to testimony from LBH's corporate

---

[8]    Cornerstone does not dispute that when they entered into the Harris II Indemnification Agreement, Lehman Brothers Holdings, Lehman Brothers Bank's parent company, owned the Harris II Loan, and that Lehman Brothers Bank could sell the loan back to Cornerstone.

representative admitting that he had no specific writing demonstrating that LBH had authorized LBB to enter into the Indemnification Agreements.  Under New York's statute of frauds, however, an agreement is enforceable if it is signed by the party against whom enforcement is sought.  *See, e.g.*, *Lane v. F.M. Ring Assoc., Inc.*, 554 N.Y.S.2d 191, 192 (N.Y. [1st Dep't 1990]) ("The agreement was signed by defendant and is therefore enforceable against it . . . .  Although not signed by all of them, plaintiffs may enforce the agreement against the defendant because it was clearly made for their benefit.").  Both of the Harris Indemnification Agreements are signed by Cornerstone's executive vice president, Judith Belanger, and are therefore valid and enforceable against Cornerstone.

Finally, Cornerstone challenges the validity of the assignment of LBB's rights under the Indemnification Agreements.  Cornerstone argues that LBB needed Cornerstone's permission to assign its rights under the agreements.  In support, Cornerstone points to Section 11(a) of the Harris Indemnification Agreements.  Section 11(a) states that "[t]his Agreement shall be binding upon and inure to the benefit of the parties hereto and their respective successors and permitted assigns." (Docket Entry No. 63, Ex. 1-O, Harris I Indemnification Agreement).  Cornerstone argues that "permitted assigns" means that LBB had to get Cornerstone's permission before assigning any rights under the indemnification agreements. Under New York law, "the benefits and burdens of contracts are freely assumed or assigned absent a contractual provision to the contrary."  *Corbett v. Firstline Security, Inc.*, 687 F. Supp. 2d 124, 129 (E.D.N.Y. 200) (citing *In re Stralem*, 303 A.D.2d 120, 123, 758 N.Y.S.2d 345 (2d Dep't 2003) ("Under New York law, contracts are freely assignable absent language which expressly prohibits assignment.")); *Rhythm & Hues, Inc. v. Terminal Mktg. Co., Inc.*, No. 1 Civ. 4697(DAB)GWG, 2004 WL 941908, at *9 (S.D. N.Y. May 4, 2004) ("Under New York law, only express limitations on assignability are enforceable.").  The phrase "permitted

28

assigns," standing alone, does not expressly prohibit or limit assignment, nor is there any express language in the contract which provides a basis to conclude that the parties wished to limit assignment.   As a matter of law, LBB's assignment of its rights under the Indemnification Agreements did not violate those agreements.   This argument does not provide a basis to deny LBH's motion or to grant Cornerstone's motion for summary judgment.

### 5.   Damages

Cornerstone argues that LBB did not suffer damages from Cornerstone's breach of the Indemnification Agreements and that because LBH "stands in the shoes" of Lehman Brothers Bank, it cannot assert a claim for damages. Although the general rule is that an assignee "stands in the shoes of the assignor," the rule does not support Cornerstone's argument.  Under New York law, "an assignee stands in the shoes of the assignor [and] takes all rights of the assignor, no greater, no less." *See, e.g.*, *O'Brien v. Argo Partners, Inc.*, No. CV 09-1020, 2010 WL 3463312, at *5 (E.D. N.Y. Aug. 23, 2010).

The evidence shows that LBH acquired the Harris Loans as well as the rights under the Loan Purchase Agreement, Seller's Guide, and Indemnification Agreements, by assignment.   Had LBB retained the loans and not assigned its rights under the Agreements, LBB could have demanded repurchase or indemnification.   But LBB did not retain the loans or its rights under the Agreements; it sold the loans and assigned its rights to LBH.   LBH now stands in LBB's shoes and may assert LBB's rights under the Agreements.  As one court has noted, "[w]hile it is correct that an assignee stands in the shoes of its assignor and cannot stand in better position than its assignor, an assignee should nevertheless be given the chance to fully and fairly litigate the rights it claims to have acquired by assignment."  *See, e.g.*, *Sunridge Dev. Corp. v. RB & G Eng'g, Inc.*, 230 P.3d 1000,

29

1003 (Utah 2010). LBB cannot now assert its rights under the Agreements or claim contract damages against Cornerstone because it sold the loans and assigned its rights under the Agreements to LBH before incurring damages. But LBH may assert its assigned rights under the Loan Purchase Agreement and Seller's Guide, including the right to seek recovery of damages incurred after the assignment. This argument does not provide a basis to deny LBH's motion or to grant Cornerstone's motion for summary judgment.

### 6.   "An Absurd Result"

Cornerstone argues that if this court finds a duty owed to LBH under the Harris Indemnification Agreements, that would be an "absurd result" and therefore forbidden under New York law. Cornerstone argues:

> . . . . LBH claims that LBB assigned to it rights under the Harris Indemnifications via the Indemnification Agreement dated June 25, 2010. According to LBH's testimony and documents, it acquired the Harris I Loan on April 19, 2007, sold it to a trust on May 30, 2008, and allegedly incurred damages in that sale.
>
> However, Cornerstone's duty to indemnify for losses on the Harris Loans ran exclusively to LBB at all times prior to the June 25, 2010 Indemnification Assignment. Thus, requiring Cornerstone to indemnify [LBH] for losses, if any, that LBH had accrued as of May 30, 2008 would mean that Cornerstone would have indemnified *both LBB and LBH at the same time*.

(Docket Entry No. 65, at 12).

Cornerstone's argument appears to be that a party is only entitled to indemnification for events that occur during the period it has a contractual indemnification right. According to Cornerstone, an assignee cannot be indemnified for damages that accrued when the assignor owned the indemnification rights. But, as *Love Funding* makes clear, an assignee may sue for damages from contract breaches occurring before the assignment. *See Love Funding Corp.*, 591 F.3d 116,

121–22.  Finding that LBH may assert indemnification rights under the Indemnification Agreement does not subject Cornerstone to multiple indemnification claims.  This argument does not provide a basis for denying LBH's motion or granting Cornerstone's motion for summary judgment.

### 7.    Damages Related to the Harris II Loan

Cornerstone argues that "there is a fact question whether [LBH] has incurred any damages on the Harris II Loan."  (Docket Entry No. 65, at 12).  LBH moved for partial summary judgment, only as to liability, not damages.  This argument does not provide a basis to deny LBH's motion or grant Cornerstone's.  *See* FED. R. CIV. P. 56(g) ("If the court does not grant all the relief requested by the motion, it may enter an order stating any material fact — including an item of damages or other relief — that is not genuinely in dispute and treating the fact as established in the case.").  Moreover, LBH has produced evidence demonstrating that it incurred damages because of Cornerstone's breach of the Harris II Indemnification Agreement.  Its evidence shows that after conducting an equity analysis, it "charged off" the Harris II Loan on or around January 23, 2009, resulting in losses of $399,225.20.  (Docket Entry No. 63, 1, Trumpp Aff., ¶ 24; Ex. 1-BB).  At the least, a fact issue exists as to damages.  Cornerstone's arguments on damages do not provide a basis to deny LBH's motion or to grant Cornerstone's cross-motion.

### 8.    Repurchase Under the Loan Purchase Agreement and Seller's Guide

Cornerstone argues that under the Seller's Guide, repurchase is the exclusive remedy for early payment default.  Cornerstone points out that sections 701–03 of the Seller's Guide establish the seller's representations, warranties, and covenants.  Cornerstone argues that the indemnification clause, section 711, only applies to breaches of sections 701–03.  *See* (Docket Entry No. 63, Ex. 1-B, Seller's Guide, § 701–03, 711).  Cornerstone argues that because early payment default is not

31

defined until section 715, it does not give rise to an indemnification claim. Cornerstone further urges that because section 715 refers to section 710 (the repurchase provision), repurchase is the exclusive remedy for early payment default.

Under New York law, "[t]he objective of contract interpretation is to give effect to the expressed intentions of the parties." *ISC Holding AG v. Nobel Biocare Invs. N.V.*, 351 F. App'x 480, 482 (2d Cir. Oct. 27, 2009). A court should "adopt an interpretation which gives meaning to every provision in the contract." *See, e.g.*, *GSI Commerce Solutions, Inc. v. BabyCenter, L.L.C.*, 618 F.3d 204, 214 (2d Cir. 2010). "When provisions in the agreement are unambiguous, they must be given effect as written." *Aeronautical Indus. Dist. Lodge 91 of the Int'l Assoc. of Machinists & Aerospace Workers, AFL-CIO v. United Techs. Corp.*, 230 F.3d 569, 576 (2d Cir. 2000). "In New York, if a contract is straight-forward and unambiguous, its interpretation presents a question of law for the court." *Frazer Exton Dev., L.P. v. Kemper Envtl., Ltd.*, 153 F. App'x 31, 33 (2d Cir. Oct. 31, 2005) (quoting *Postlewaite v. McGraw-Hill, Inc.*, 411 F.3d 63, 67 (2d Cir. 2005)).

The contract language does not support Cornerstone's argument. Neither section 715, which defines early payment default, nor section 710, the repurchase provision, states that repurchase is the exclusive remedy for early payment default. To the contrary, the repurchase provision states: "[n]otwithstanding any other provision of the Seller's Guide or Loan Purchase Agreement to the contrary, Seller shall remain liable for all remedies hereunder." (Docket Entry No. 63, Ex. 1-B, Seller's Guide § 710). Similarly, the indemnification states: "[*i*]*n addition* to any repurchase and cure obligations of Seller, and any and all other remedies available to Purchaser . . . Seller shall indemnify . . . ." (*Id.*, § 711) (emphasis added). Construing these unambiguous provisions to give meaning to both leads to the conclusion that the remedies are not exclusive under the Seller's Guide.

32

Further, the indemnification provision explicitly states that the seller must indemnify the purchaser for any loss for "*any* breach of *any* . . . obligation . . . contained in or made pursuant to this Seller's Guide." (*Id.*) (emphasis added). Repurchasing loans that go into early payment default is an obligation contained in the Seller's Guide. Cornerstone must indemnify LBH for losses resulting from Cornerstone's failure to meet its contractual obligation to repurchase the loans. This argument does not provide a basis to deny LBH's motion or to grant Cornerstone's motion for summary judgment.

### 9.     Demanding Repurchase

Finally, Cornerstone argues that LBH may not assert damages based on Cornerstone's failure to repurchase the Harris I Loan because when LBH owned the loan, it did not demand that Cornerstone repurchase it. The evidence, however, shows that LBH was not required to demand repurchase in order to assert rights under the Loan Purchase Agreement and Seller's Guide.

The Seller's Guide repurchase provision states:

> [I]f a loan becomes an Early Payment Default in accordance with *Section 715* herein, Seller shall, at Purchaser's option, repurchase the related Mortgage Loan . . . at the Repurchase Price. Any such repurchase shall occur no later than thirty (30) days after the earlier of the date on which Purchaser notifies Seller of such breach *or the date on which Seller knows of such breach.*

(Docket Entry No. 63, Ex. 1-B, Seller's Guide § 710). Cornerstone received notice that the Harris I Loan went into early-payment default on March 19, 2007. That was when Aurora Loan Services sent notice to Cornerstone the loan was in early-payment default and demanded that Cornerstone repurchase the loan within thirty days. (Docket Entry No. 60, Ex. 13). After Cornerstone received this notice, Cornerstone and LBB entered into the Harris I Indemnification Agreement. Cornerstone acknowledged that the Harris I Loan had entered into early payment default and that LBB had the

33

right to require Cornerstone to repurchase the loan.  (Docket Entry No. 63, Ex. 1-O, Harris I Indemnification Agreement).

Under the Harris Indemnification Agreement, LBB agreed to refrain from exercising its repurchase rights in exchange for Cornerstone's promise to repurchase the Harris I Loan should it become more delinquent.  Cornerstone also agreed to indemnify LBB for losses sustained on the Harris I Loan.  (*Id.*).  Harris had failed to make payments due on April 1, 2007 and on May 1, 2007 until June 5, 2007.  (Docket Entry No. 63, Ex.1-I, Harris Payment Record).  On April 21, 2007, Aurora Loan Services sent Cornerstone a second notice letter demanding that Cornerstone repurchase the loan.  (Docket Entry No. 63, Ex. 1-P, April 21, 2007 Aurora Loan Services Demand Letter).  Cornerstone did not do so.

The record shows that LBB assigned to LBH all its rights under the Loan Purchase Agreement, the Seller's Guide, and the Harris I Indemnification Agreement.  Because of the assignment, LBH had the right to have Cornerstone repurchase the loan or to indemnify against losses.  Even if LBH did not demand that Cornerstone repurchase the loan, under the unambiguous terms of the Harris I Indemnification Agreement and Seller's Guide, Cornerstone, having notice that the loan was in early payment default, had an obligation to repurchase the loan or to indemnify against losses.  This argument does not provide a basis to deny LBH's motion or to grant Cornerstone's motion for summary judgment.

**V.     Conclusion**

LBH's motion for partial summary judgment, (Docket Entry No. 55), is denied based on one issue of fact; Cornerstone's motion for summary judgment, (Docket Entries No. 57, 59), is denied; Cornerstone's motions to strike, (Docket Entries No. 64, 69) are denied; and the parties' motions

to file documents under seal, (Docket Entries No. 56, 61, 62) are denied.

SIGNED on February 10, 2011, at Houston, Texas.

Lee H. Rosenthal
United States District Judge